UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Jeanette Partridge,
individually and as
executrix of the estate
of Timothy Partridge

    v.                             Civil No. 14-cv-170-JL
                                     Opinion No. 2015 DNH 057
USAA Life Insurance
Company

**MEMORANDUM ORDER**

This case arises from tragic circumstances:  the suicide of
the plaintiff's husband, Dr. Timothy Partridge, just before the
two-year suicide exclusion in his life insurance policy with the
defendant, USAA Life Insurance Company, expired.  Based on this
exclusion, USAA Life refused to pay the $1 million death benefit
to the named beneficiary, plaintiff Jeanette Partridge.

Mrs. Partridge responded by bringing this action against
USAA Life in Rockingham County Superior Court, claiming that USAA
Life breached the policy by refusing to pay the death benefit.
Specifically, she claims that the policy's suicide exclusion is
void because its scope exceeds that permitted by the New
Hampshire Department of Insurance.  See N.H. Code R. Ins.
401.04(m)(3)(a).  Mrs. Partridge further claims that USAA Life
was negligent in failing to process Dr. Partridge's life
insurance application "diligently and within a reasonable period
of time," causing "loss of the value of the life insurance

policy" and other damages.[1]  USAA Life removed the action to this
court, which has jurisdiction under 28 U.S.C. § 1332(a)(1)
(diversity), since Mrs. Partridge is a citizen of New Hampshire
while USAA Life is a Texas corporation with its principal place
of business there,[2] and the amount in controversy exceeds
$75,000.

The parties have filed cross-motions for summary judgment,
see Fed. R. Civ. P. 56, with Mrs. Partridge moving for judgment
in her favor on her claim that the policy's suicide exclusion is
void, and USAA moving for judgment in its favor on both of Mrs.
Partridge's claims.  As Mrs. Partridge points out, while the New
Hampshire insurance regulations limit the suicide exclusion in a
life insurance policy to "[d]eath resulting from suicide within 2
years of the issue date of the policy," N.H. Code R. Ins.
401.04(m)(3)(a), her husband's policy excluded the full death
benefit "[i]f the insured dies by suicide, while sane or insane,

_____

[1]Mrs. Partridge's complaint included a third claim, alleging
violations of N.H. Rev. Stat. Ann. § 417:3 (prohibiting unfair or
deceptive acts or practices in the business of insurance), but
she later voluntarily dismissed that claim with USAA's assent.

[2]In this regard, USAA Life is to be distinguished from its
parent company, USAA, which courts have treated as an
unincorporated association with the citizenship of all of its
members--who reside in all 50 states, making diversity
jurisdiction unavailable to it.  See, e.g., Tuck v. United Servs.
Auto. Ass'n, 859 F.2d 842, 844-45 (10th Cir. 1988); Baer v.
United Servs. Auto Ass'n, 503 F.2d 393, 394-95 (2d Cir. 1974).

within 2 years from the Effective Date of the policy," which, here, was the date USAA Life received payment of its first premium.  Mrs. Partridge argues that these differences--the inclusion of the "while sane or insane clause" and the substitution of "effective date" for "date of issue"--serve to void the exclusion in its entirety under the insurance regulations, which provide that "any policies that contain any exclusions violating this part shall be operative as if such prohibited exclusions were not included."  Id. 401.04(m)(1).

USAA Life, however, responds that (A) policy exclusions need only "[c]ontain language substantially similar to the language" set forth in the regulations, id. 401.04(m)(2)(a), and "effective date" as used in its policy is, in substance, the same as "date of issue" as used in the regulations, and (B) even if the other offending phrase identified by Mrs. Partridge, "while sane or insane," is stricken from the policy as required by Rule 401.04(m)(1), the exclusion still operates to disqualify her from receiving the full death benefit, since there is no evidence (or even any allegation) that Dr. Partridge was insane at the time of his suicide.  USAA Life further argues that Mrs. Partridge's negligence claim fails for lack of any duty it owed Dr. Partridge to process his application "diligently" or, for that matter, any evidence that it breached that duty, even if it was owed, or that

any such breached proximately caused the damages that Mrs.
Partridge seeks to recover.  As fully set forth below, the court
agrees with USAA Life and, following oral argument, grants its
motion for summary judgment in its entirety (and denies Mrs.
Partridge's cross-motion).

## I.   **Applicable legal standard**

Summary judgment is appropriate where "the movant shows that
there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law." Fed. R. Civ.
P. 56(a).  A dispute is "genuine" if it could reasonably be
resolved in either party's favor at trial, and "material" if it
could sway the outcome under applicable law.  See Estrada v.
Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010).  In analyzing a
summary judgment motion, the court "views all facts and draws all
reasonable inferences in the light most favorable to the
non-moving" parties.  Id.  On cross-motions for summary judgment,
"the court must consider each motion separately, drawing
inferences against each movant in turn."  Merchants Ins. Co. of
N.H., Inc. v. U.S. Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir.
1998) (quotation marks omitted).  These inference-shifting rules
are largely academic here, however, since, as discussed infra,
the material underlying facts are almost all undisputed.

4

II. **Background**

Dr. Partridge submitted an application for a life insurance policy with USAA Life on March 30, 2011.  (He had previously applied for and received a different life insurance policy from USAA Life, issued in 2004.)  The application notified Dr. Partridge that "no insurance coverage will take effect prior to delivery of the policy" to him "and then only if," in addition, "the health and insurability of each person is as stated in this application" and "the company has received the first full premium payment while each person is alive."  In completing the application, Dr. Partridge indicated that premium payments would be made on the 26th day of each month, by way of an automatic withdrawal from a specified account.  He also designated Mrs. Partridge as the primary beneficiary.

Less than two months later, on May 27, 2011, USAA Life notified Dr. Partridge via letter that his application for the life insurance policy had been approved.  This letter recited an "[e]ffective date" for the policy of June 26, 2011, and advised Dr. Partridge that USAA Life would "deliver [his] policy shortly after the effective date."  USAA Life later explained to Dr. Partridge, in a telephone conversation of June 2, 2011, that the company had determined the effective date of the policy based on the day of the month he had chosen to make the premium payment in

5

his application, as just discussed.  Dr. Partridge made no
objection, nor did he ask to remit his first premium payment any
earlier.  USAA Life subsequently delivered a copy of Dr.
Partridge's life insurance policy to him.

Like the letter confirming that USAA had accepted Dr.
Partridge's application, the policy listed its "effective date"
as June 26, 2011, defining that term as "the date on which
coverage starts.  Premium due dates, policy months, years and
anniversaries are measured from that date."  In a section marked
"Suicide Exclusion," the policy stated in relevant part that

> [i]f the [i]nsured dies by suicide, while sane or
> insane, within two years from the Effective Date of the
> policy or from the effective date of the last
> reinstatement, if any, we will pay a reduced death
> benefit equal to . . . [t]he premiums paid for benefits
> on the [i]nsured's life[.]

(formatting altered).  The policy identified Mrs. Partridge as
its primary beneficiary.

Dr. Partridge died by suicide on June 25, 2013--just two
days shy of the expiration of two-year period during which the
suicide exclusion remained in effect.  Invoking the exclusion,
USAA Life refused to pay the entire death benefit to Mrs.
Partridge, though it tendered an amount equal to the premiums

remitted as of that time, which Mrs. Partridge declined to accept.[3]  She promptly commenced this action.

III. **Analysis**

Mrs. Partridge does not dispute that, under the terms of Dr. Partridge's policy, the suicide exclusion applies, disentitling her to the full death benefit.  Instead, as noted at the outset, she claims that the policy's suicide exclusion differs from the suicide exclusion permitted by the New Hampshire insurance regulations, voiding it.  She further claims that USAA Life owed Dr. Partridge a duty in negligence to "[p]rocess[] the entire application diligently and within a reasonable period of time," and that it breached this duty, resulting in "loss of the value of the life insurance policy," among other damages.  As fully discussed below, both of these claims fail, with the result that USAA Life is entitled to summary judgment.

A.    **New Hampshire insurance regulations**

Rule 401.04(m) of the New Hampshire insurance regulations specifies "the only exclusions permitted in an individual life policy" like Dr. Partridge's policy with USAA Life, stipulating

───────────

[3]Mrs. Partridge notes that USAA Life paid her the full death benefit under Dr. Partridge's older policy.  While the record does not disclose this sum, Dr. Partridge's application for the policy at issue here stated that he already had more than $1 million in life insurance at that time.

7

that "any policies that contain any exclusions violating this part shall be operative as if such prohibited exclusions were not excluded." N.H. Code R. Ins. 401.04(m)(1).  The rule further provides that any "[p]olicy exclusion provisions shall contain language substantially similar to the language of the following subclauses." Id. 401.04(m)(2)(a).  Among the permitted exclusions set forth in those subclauses is an exclusion for "[d]eath resulting from suicide with 2 years of the issue date of the policy, or, if later, the last date on which reinstatement was applied for in writing and accepted by the insurer." Id. 401.04(m)(3)(a).

Again, Mrs. Partridge argues that the language of the suicide exclusion in Dr. Partridge's policy differed from the language permitted by Rule 401.04(m) in two respects.  First, she points out, the policy modifies "suicide" with the phrase "while sane or insane," which does not appear in the rule.  Second, Mrs. Partridge adds, the policy uses the term "effective date," rather than the term "date of issue," to identify the day on which the two-year exclusion period begins running.  As a consequence of either or both of these variances, she concludes, "the exclusion contained in the policy is substantially different than that allowed by the Rules, [so] the policy must be read as though it

did not contain the exclusion at all."  As fully explained below,
the court disagrees.

### 1.  **"while sane or insane"**

USAA Life more or less assumes for the sake of argument that
the inclusion of the phrase "while sane or insane" in its
policy's suicide exclusion results in language that is not
"substantially similar" to that dictated by Rule 401.04(m).[4]  Cf.
Cole v. Combined Ins. Co., 125 N.H. 395 (1984) (reasoning that,
because "one who commits suicide within the meaning of [a life
insurance] policy must . . . have the capacity to choose
effectively to do or not to do the act," an "exclusion of
coverage in a life insurance policy for death by suicide [alone]
may be defeated by proof that the death resulted from the
decedent's insanity").  Even so, USAA Life argues, "the deletion
of the 'sane or insane' clause in [its] suicide exclusion would
have absolutely no impact on the applicability of [the] exclusion
here," since "there is no evidence or contention that Dr.
Partridge was insane" at the time of his suicide or otherwise.

---

[4]While USAA Life stops short of disputing that point, it
also asserts that the form of the policy it issued Dr. Partridge
was approved by the New Hampshire Department of Insurance.
Generally, though, a state insurance commissioner's "[a]pproval
of a form does not per se establish its validity."  44 C.J.S.
Insurance § 479, at 559-60 (1993); cf. Cont. Ins. Co. v. Charest,
91 N.H. 378, 380 (1941) (insurance commissioner "may not approve
[policy] terms inconsistent with [a governing statute]").

So far as the court can tell from the parties' summary
judgment submissions, there is indeed no such evidence or
contention.[5]  Nor does Mrs. Partridge elaborate on her statement,
in her memorandum supporting her summary judgment motion, that
because "the exclusion contained in the policy is substantially
different than that allowed by the Rules, the policy must be read
as though it did not contain the [suicide] exclusion at all."

While, so far as this court can tell, the New Hampshire
Supreme Court has not directly passed upon this issue, other
authorities dealing with conflicts between statutory limits on
life insurance policy exceptions and policy provisions support
USAA Life's position.  As one leading commentator notes, in such
instances, the law simply "'treats the contract as embodying the

---

[5]At oral argument, counsel for Mrs. Partridge pointed to one
statement from her complaint and another from her affidavit in
support of her summary judgment motion referencing "psychological
symptoms" and "severe anxiety" that Dr. Partridge began
experiencing in the months before he took his own life.  These
statements fall considerably short of contending that Dr.
Partridge was insane at the time of his suicide, and they
certainly do not constitute evidence of that proposition.  It is
true, as Mrs. Partridge emphasized, that USAA Life has the burden
of proving that Dr. Partridge was not insane at the time of his
suicide in order to avail itself of the exclusion permitted under
Rule 401.04(m)(3), but, again, USAA Life's summary judgment
filings point to the absence of any evidence of Dr. Partridge's
insanity, and Mrs. Partridge has not responded with any contrary
proof.  This requires the entry of summary judgment for USAA Life
on any claim that Dr. Partridge was in fact insane at the time of
his suicide--assuming, contrary to the record, that such a claim
was even made here.  See, e.g., Gulf Coast Bank & Trust Co. v.
Reder, 355 F.3d 35, 39 (1st Cir. 2004).

statutory clause, and resolves the apparent conflict in favor of
the statute.  The inconsistent provisions of the policy yield to
it.'" 16 Richard A. Lord, Williston on Contracts § 49:102 (rev.
4th ed. 2014) (quoting Foster v. Washington Nat'l Ins. Co., 192
A. 59, 61 (N.J. 1937)); see also 29 Betram Harnett & Irving
Lesnick, Appleman on Insurance § 177.02[B], at 6 (Eric Mills
Holmes, ed., 2d ed. 2006) (noting that laws "generally have
provided for [life insurance] policies, which, accidentally or
through deliberate insurer violation . . . include prohibited
language[,] by requiring that any nonconforming policy shall be
enforceable as if conformed to such . . . prohibitions")
(quotation marks and footnote omitted).  This court has found no
authority supporting Mrs. Partridge's contrary view--that a
policy exclusion exceeding that permitted under state law is void
in its entirety--and, again, she has provided none.

Moreover, the New Hampshire Supreme Court has taken the same
approach, albeit in the slightly different context of automobile
liability insurance policies with exclusions exceeding those
permitted under the state's Financial Responsibility Act, N.H.
Rev. Stat. Ann. § 259:61, I.  Universal Underwriters Ins. Co. v.
Allstate Ins. Co., 134 N.H. 315, 318 (1991).  There, an
automobile liability policy provided that, if the vehicle was in
the care, custody, or control of any person other than the named

11

insured at the time of an accident, the policy would provide only
excess coverage for any resulting claim--a provision that the
court found invalid under the Act.  Id. at 316-17.  Holding that
"a provision which conflicts with the [Act] cannot be a valid
part of the contract of insurance," the court ruled that the
excess coverage clause had "no effect, at least up to the minimum
limits of liability provided by the [Act]."  Id. at 318 (emphasis
added).  Thus, the court explained, the insurer had to "provide
primary coverage to [the driver] up to $25,000, which is the
minimum limit [then] established by the [Act].  Once this minimum
limit is met, however, it is not improper for [the insurer] to
make its coverage 'excess.'"  Id.

        This result cannot be squared with Mrs. Partridge's
suggested approach to policy exclusions that violate New
Hampshire law (under which the insurer in Universal Underwriters,
by dint of the unlawful nature of the excess coverage provision
in its policy, would have been prevented from relying on that
provision to make any of its coverage excess).  Nor, for that
matter, does her view jibe with the reading of Universal
Underwriters subsequently articulated by the Court of Appeals,
i.e., that "[o]bligations imposed by the New Hampshire Financial
Responsibility Law prevail over any contrary language in the
policy" but "in fairness to the insurer, beyond this the

                                    12

excluding policy terms should stand." Canal Ins. Co. v. Carolina Cas. Ins. Co., 59 F.3d 281, 283 (1st Cir. 1995).

It is difficult to think of a reason why the New Hampshire Supreme Court would take a different approach to exclusions in life insurance policies that exceed the scope permitted by Rule 401.04(m), particularly when, as just discussed, other authorities specifically call for handling overly broad life policy exclusions the same way that Universal Underwriters handled an overly broad automobile liability policy exclusion.[6] Under that approach, Rule 401.04(m) prevails over the contrary language in Dr. Partridge's policy excluding the death benefit in cases of suicide "while sane or insane," but the exclusion otherwise stands insofar as it applies simply to "suicide within

---

[6] The language of Rule 401.04(m)(1) could, at least in isolation, be read to support Mrs. Partridge's position, insofar as the rule states that "any policies that contain any exclusions violating this part shall be operative as if such prohibited exclusions were not included" (emphasis added).  In her summary judgment submissions, however, Mrs. Partridge has not engaged the language of Rule 401.04(m)(1) at all so, following suit, this court has not attempted any such interpretive exercise here. (Indeed, the treatment of this issue in her summary judgment memoranda is limited to the single unelaborated sentence quoted at the outset of this section.)  In any event, this court considers it extraordinarily unlikely that the New Hampshire Supreme Court would read Rule 401.4(m)(1) to treat overly broad exclusions in life insurance policies in a manner different from the manner in which the court has treated overly broad exclusions in automobile liability policies--not to mention the manner in which, so far as this court can tell, all other jurisdictions have treated overly broad exclusions in life insurance policies.

2 years of the issue date of the policy," as the rule stipulates.
Cf. Canal Insurance, 59 F.3d at 283.  As noted at the outset,
though, revising the policy in this manner does not entitle Mrs.
Partridge to the full death benefit, since there is no evidence
that Dr. Partridge was insane at the time of his suicide.[7]

### 2.   "Effective Date"

Mrs. Partridge further argues that the scope of the suicide
exclusion in Dr. Partridge's life insurance policy exceeds that
permitted by Rule 401.04(m) insofar as the policy excludes the

---

[7]At oral argument, counsel for Mrs. Partridge suggested that
the overly broad suicide exclusion in the USAA Life policy was
itself to blame for this state of affairs, on the theory that,
since it applied by its terms to suicide "while sane or insane,"
Mrs. Partridge was misled by USAA's reliance on it in denying her
claim, foregoing any effort to show that Dr. Partridge was insane
when he took his own life.  There are several problems with this
notion.  First, it was not articulated until oral argument, which
is generally too late.  See Doe v. Friendfinder Network, Inc.,
540 F. Supp. 2d 288, 304 n.19 (D.N.H. 2008).  Second, there is no
evidence that Mrs. Partridge relied on USAA's denial of her claim
to that effect or that, even if she had, it put her in any worse
position than she otherwise would have occupied in trying to
prove Dr. Partridge's insanity from whatever evidence remained
available after his death.  Third, Mrs. Partridge's counsel
became aware at some point in the early stages of this litigation
(if not sooner) of the fact that the policy's exclusion of
suicide "while sane or insane" was at odds with Rule 401.04(m),
yet had not developed any evidence of Dr. Partridge's insanity by
the time the case reached summary judgment--conceding at oral
argument that he knows of no medical opinion to that effect even
now.  Thus, while it might be possible that a beneficiary's
detrimental reliance on an insurer's invocation of an illegal
policy provision to deny a claim could have some estoppel effect
against the insurer in later litigation, Mrs. Partridge has
failed to properly advance or support any such theory here.

full death benefit for suicide "within two years from the Effective Date of the policy."  She emphasizes that Rule 401.04(m)(3)(a) authorizes an exclusion for "[d]eath resulting from suicide within two years of the issue date of the policy" (emphasis added), rather than the "effective date of the policy."

But, as USAA Life points out, the rule requires only that "[p]olicy exclusion provisions shall contain language substantially similar to the language" of, rather than identical to the language of, the exclusions authorized in the rule.  N.H. Code R. Ins. 401.04(m)(2)(a) (emphasis added; formatting altered).  USAA Life argues that the phrase "Effective Date of the policy" is substantially similar to the phrase "issue date of the policy" in that both phrases simply "refer to the point in time when coverage attaches."  Indeed, USAA Life notes, Dr. Partridge's policy specifically defined "Effective Date" as "the date on which coverage starts," or June 26, 2011.

Mrs. Partridge counters that "'issue date' is most properly deemed the moment when the insurance company notifies the insured that he has been approved and the insurance contract was formed." Because USAA Life so notified Dr. Partridge on May 27, 2011, she argues, that was the "issue date of the policy," creating a conflict between its suicide exclusion and the rule that such a provision run from the "effective date of the policy."

15

As a leading authority on insurance law has observed, however, the phrase "date of issue" in a life insurance policy "refers to the date of issue appearing on the face of the policy."  17 Steven Plitt et al., Couch on Insurance § 240:34 (3d ed. 1997) ("Couch") (citing, inter alia, Mut. Life Ins. Co. of N.Y. v. Hurni Packing Co., 263 U.S. 167 (1923)); see also, e.g., Progressive Enters., Inc. v. New Eng. Mut. Life Ins. Co., 538 F.2d 1057, 1060 (4th Cir. 1976) ("the 'date of issue," as used in [a] suicide exclusion provision, must be assumed to be either the actual date of issue of the policy or its formal date," rather than the date on which the insurer accepted the insured's application).  Mrs. Partridge does not provide any authority to support her contrary interpretation of the phrase "date of issue" in a suicide exclusion to mean "the moment when the insurance company notifies the insured that he has been approved," even though coverage has yet to take effect.

While Mrs. Partridge asserts that the New Hampshire Supreme Court's decision in Bickford v. Metropolitan Life Insruance Co., 114 N.H. 237 (1974), "suggests that a similar result is permissible," that case in fact supports the opposite conclusion. In Bickford (decided years before Rule 401.04(m) was promulgated) the decedent's life insurance policy excluded coverage for death by suicide "within two years from the date of issue."  Id. at

239. Because, upon receipt of the decedent's application--but prior to the commencement of coverage under the policy--the insurer had issued him a temporary insurance agreement, the beneficiary argued that "the effective period of the suicide clause should [have] commenced" at that point. Id. at 240. In rejecting this argument, the New Hampshire Supreme Court observed that "the policy expressly imposed the two-year suicide clause from the date of issue," and that, prior to that point, the decedent had been "without insurance" since the temporary agreement had expired. Id. at 241. In Bickford, then, the New Hampshire Supreme refused to do precisely what Mrs. Partridge is urging this court to do here--read "date of issue" to commence the running of a suicide exclusion in a life insurance policy at a time prior to the commencement of coverage.

The extrajurisdictional cases that Mrs. Partridge cites also do not support her reading of "issue date." Those cases interpreted the phrase "date of issue," as it commenced the running of the suicide exclusion in a particular life insurance policy, to mean a date after the point at which coverage took effect. See Crowley v. Travelers Ins. Co., 196 F.2d 315, 316 (5th Cir. 1952); Oakes v. Franklin Life Ins. Co., 516 F. Supp. 445, 446 (E.D. Pa. 1981); Byram v. Equitable Life Assurance Soc'y

17

of U.S., 180 F. Supp. 620, 623-24 (E.D. La. 1959).[8]  So these cases do not support her argument that, by restricting suicide exclusions to "within 2 years of the issue date of the policy," Rule 401.04(m) requires that period to commence <u>before</u> coverage even does, simply because the insurer has agreed to provide that coverage at some point in the future.  Those cases do not say, in other words, that "date of issue" means "date of agreement to issue," and this court is unaware of any case that has.

As this court has observed, "New Hampshire courts apply general principles of statutory construction in interpreting administrative rules." Conservation Law Found. v. Pub. Serv. Co. of N.H., 2013 DNH 167, 12 (citing In re Town of Pittsfield, 160 N.H. 604 (2010) and In re Parker, 158 N.H. 499 (2009)).  One of those principles is that a court will not "consider what the [agency] might have said or add language that the [agency] did not see fit to include." New Hampshire v. Dor, 165 N.H. 198, 199 (2013).  Because the New Hampshire Department of Insurance used

[8]In Crowley and Byram, as Mrs. Partridge points out, "the contracting parties agreed that after the application was approved, the effective date of coverage would relate back to the date of the application" (capitalization omitted).  Similarly, in Oakes, upon receipt of the insured's application, the insurer provided the insured with "temporary or interim coverage pending its decision to reject the application or issue a policy." 516 F. Supp. at 446.  The beneficiaries in these cases, then, argued (unsuccessfully) that the suicide exclusion should have started running when coverage first became effective, rather than upon the subsequent "date of issue" stated in the policy.

the phrase "issue date of the policy," rather than "date of agreement to issue the policy," in specifying the permissible commencement date of a suicide exclusion, this court rejects Mrs. Partridge's proffered reading of Rule 401.04(m) to require the two-year period for such an exclusion to run from the date when the insurer agrees to provide coverage, rather than the date on which coverage actually commences.[9]

It follows that, by excluding coverage for death by suicide "within two years from the Effective Date of the policy," and defining the "Effective Date" as "the date on which coverage starts," USAA Life's policy with Dr. Partridge used "language substantially similar to the language" of Rule 401.04(m)(3)(a), which allows exclusions for suicide "within 2 years of the issue

---

[9]Mrs. Partridge argues that, because the avowed purpose of the rule is "protecting the public and ensuring their fair treatment by the insurance industry[,] . . . the two year time period should be deemed to begin at the earliest logical and reasonable moment in time." There are at least two problems with this argument. First, "[w]here the words of [a regulation] are clear and free from ambiguity, the letter of the [regulation] may not be disregarded under the pretext of pursuing its spirit." Roberts v. Town of Windham, 165 N.H. 186, 191 (2013) (quotation marks omitted). Rule 401.04(m) does not require the running of a suicide exclusion period to begin "at the earliest logical and reasonable time," but upon the "date of issue of the policy"--a phrase that, as just discussed, cannot be read to refer to a time predating the commencement of the policy's coverage. Second, and relatedly, it is open to serious question whether it is "logical and reasonable" for periods of exclusion from coverage to start running before the coverage itself does. It bears repeating that Mrs. Partridge has not provided any case law construing a suicide exclusion to operate in that fashion.

date of the policy." Accordingly, the court grants USAA Life's motion for summary judgment in its favor, and denies Mrs. Partridge's motion for summary judgment in her favor, on her claim that, because the exclusion in its policy violates the rule, USAA Life breached the policy by relying on the exclusion to refuse to pay her the full death benefit.

### B.   Negligence

USAA Life has also moved for summary judgment in its favor on Mrs. Partridge's claim that USAA Life was negligent in failing to process Dr. Partridge's life insurance application "diligently and within a reasonable period of time." "To recover for negligence, the plaintiff must demonstrate that the defendant had a duty to the plaintiff, that [the defendant] breached that duty, and that the breach proximately caused injury to the plaintiff." England v. Brianas, 166 N.H. 369, 371 (2014).

USAA Life argues that Mrs. Partridge cannot demonstrate any of these elements, because (a) it owed no duty to Dr. Partridge to process his application within a reasonable time, (b) even if it did, there is no evidence that it failed to do so, and (c) in any event, any such failure was not the proximate cause of the injuries Mrs. Partridge seeks to recover (in particular the lost value of the life insurance policy), because they were not reasonably foreseeable. As fully explained below, USAA Life is

20

entitled to summary judgment on the negligence claim.  Even
assuming that it owed Dr. Partridge a duty to process his
application "within a reasonable time"--and this court harbors
serious doubts that New Hampshire law imposes such a duty under
the circumstances of this case--no rational trier of fact could
find that USAA Life failed to do so based on the evidence of
record and, regardless, the injury that Mrs. Partridge suffered
was not a reasonably foreseeable consequence of any such failure.

As an initial matter, while Mrs. Partridge maintains that
the New Hampshire Supreme Court recognized an insurer's duty to
act on an application within a reasonable time in Hadler v. Great
Eastern Life Insurance Co., 109 N.H. 453 (1969), this court does
not read that decision so broadly.  In Hadler, the decedent, who
"was in poor health and had been refused insurance by at least
one company," applied for a life insurance policy with the
defendant insurer, which "specialized in substandard risks."  Id.
at 454.  The defendant then "referred the matter" to a
reinsurance company, which ultimately "accepted [the]
application."  Id. at 455.  In the meantime, the decedent had
submitted a check for 20 percent of the annual premium, which the
defendant had cashed, and "discussed the case several times with
defendant's chief underwriter and was advised that a policy was
being issued."  Id.  That had yet to occur at the time the

21

decedent died, however, and the insurer refused to pay the death benefit on that basis.  Id.

The New Hampshire Supreme Court reversed the trial court's entry of a directed verdict for the defendant on the estate's claim "for damages due to the alleged negligent failure of the defendant to issue [the] policy."  Id. at 454.  In explaining this decision, the court observed that

> [a]uthorities are divided as to whether liability may
> be based on negligent failure to act on an application
> within a reasonable time.  The rationale of the cases
> denying liability is that the insurer, like any other
> offeree, is under no legal duty to act on the
> application and therefore tort liability is precluded.
> Those upholding liability base their position on
> various reasons, such as the public interest of
> insurance companies operating under franchises, the
> unequal bargaining positions of the parties, the nature
> of the risk furnishing sufficient danger from delay to
> impose a duty to act diligently, implied contract, and
> when the premium has been paid on the basis of trust
> and [*sic*] something akin to unjust enrichment by
> retaining the premium without risk for an unreasonable
> time.

Id. at 456.  But the court in Hadler did not say which line of authority it found more persuasive, or why.

Instead, the court went on to state that "[t]he situation presented in this case, however, goes beyond a claim based upon delay in accepting the application," since "[t]he application had in fact been accepted," and the applicant "had paid all he had been asked to pay on the premium, and there is nothing to indicate that he was not ready to pay the balance."  Id.

22

Furthermore, the court observed, the insurer "knew [the applicant] was in poor health and that the risk of death was great."  Id.  Thus, the court reasoned,

> [i]n these circumstances, the reasons given by courts for non-liability for delay in accepting applications do not apply.  Defendant was not a mere offeree.  Most of the reasons given for imposing liability for negligent delay in accepting an application . . . apply with even greater force to the situation in this case.  Under the circumstances, we hold that the defendant had the duty to issue and deliver the policy within a reasonable time after acceptance of the risk by [the reinsurer].

Id. at 456-57 (emphases supplied; formatting altered).  The court therefore ruled that "the evidence presented a jury question" on the estate's claim for negligence.  Id. at 457.

So, far from recognizing that every insurer has the "duty to process applications diligently," as Mrs. Partridge asserts, Hadler recognizes only that such a duty may arise under certain "circumstances," i.e., those going "beyond a claim based upon delay in accepting the application."  Id. at 456.  Indeed, it is not even accurate to describe the claim validated in Hadler as a claim for negligent delay in acting on an insurance application since, as just discussed, the application in that case had been accepted--the insurer's alleged negligence lay in breaching its duty "to issue and deliver the policy within a reasonable time after acceptance of the risk."  Id. at 457.

23

Here, in contrast, Mrs. Partridge faults USAA Life for its
alleged delay in acting on Dr. Partridge's application for the
policy, rather than in any delay in issuing the policy after his
application had been accepted.  It is undisputed, in fact, that
the 30-day delay between USAA Life's acceptance of the
application and the effective date of the policy resulted from
Dr. Partridge's choice not to remit the first premium payment
until the 26th day of the month following the approval (a choice
that he stuck by even after USAA Life advised him, on June 2,
2011, that it meant his policy, though already approved, would
not take effect until June 26, 2011).  Mrs. Partridge's claim is
a "claim based on a delay in accepting the application"--the very
claim that the Hadler court distinguished from that presented by
the circumstances of that case.  Id. at 456.  So Hadler simply
did not recognize the duty that Mrs. Partridge seeks to enforce.

Nor, however, did the court in Hadler reject the existence
of such a duty; instead, as just discussed, it acknowledged that
"[a]uthorities are divided as to whether liability may be based
on negligent failure to act on an application within a reasonable
time," without deciding which of those authorities to follow.
Id. at 456.  So far as this court can tell, the New Hampshire
Supreme Court has yet to make this choice, though, as Mrs.
Partridge points out, it later considered a claim that an insurer

24

"was negligent in processing [a life insurance] application and caused delays which prevented the policy from being issued at an earlier date." Bickford, 114 N.H. at 240.  There, however, the court did not discuss whether New Hampshire law recognized such a claim, or even cite to Hadler on that point, but merely upheld the verdict for the defendant because "[t]he record demonstrates that the defendant company acted promptly on the application once it received the proper information." Id. at 241.

Because the New Hampshire Supreme Court has, accordingly, never held that an insurer has the duty to act on an application

for a policy within a reasonable time,[10] this court, exercising diversity jurisdiction, is hesitant to come to that conclusion on its own.  Indeed, where state "courts have not adopted plaintiffs' theory of the case," a federal court sitting in diversity has "no warrant to extend" state law to accommodate it. Hatch v. Trail King Indus., Inc., 656 F.3d 59, 70 (1st Cir. 2011).  Nevertheless, this court will simply assume for the sake of argument that USAA Life owed Dr. Partridge (or Mrs. Partridge,

---

[10]This court disagrees with Mrs. Partridge that the existence of such a duty is "buttressed by the Restatement (Second) of Torts §§ 323 and 324 [1965], which have been adopted as the law of New Hampshire."  The New Hampshire Supreme Court has cited favorably to those provisions of the Restatement, see Corson v. Liberty Mut. Ins. Co., 110 N.H. 210, 213-14 (1970), which recognize liability in negligence for "[o]ne who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things." Restatement (Second) Torts § 323; see also id. § 324A (recognizing identical duty as to services to be rendered another for a third person's protection).  While, as Mrs. Partridge points out, this rule has been repeatedly applied to defendants who assume responsibility to procure or maintain insurance for the benefit of the plaintiff but then negligently fail to do so, it has never, so far as the case citations indicate, been used to hold an insurer itself liable for its delay in accepting an application for a policy.  See id. § 323 reporter's note.  Indeed, it makes no sense to say that, by dint of receiving an application for a policy, an insurer undertakes a duty to procure insurance for the applicant.  That duty arises only if the insurer accepts the application and agrees to issue the policy (perhaps not coincidentally, that was the very distinction, between the receipt of the application and its approval, emphasized by the court in Hadler).  The New Hampshire Supreme Court's approval of Restatement (Second) of Torts §§ 323 and 324A says little if anything about its view of an insurer's duty to process an application in a reasonable time.

as the beneficiary designated in his application) a duty under New Hampshire common law to act on his application within a reasonable time.  USAA Life would still be entitled to summary judgment on the negligence claim, for at least two reasons.

First, as USAA Life argues, Mrs. Partridge has failed to come forward with evidence from which a rational trier of fact could find that the company unreasonably delayed acting on Dr. Partidge's application.  It is undisputed that Dr. Partridge submitted his application on March 30, 2011, and that USAA Life notified him that his application had been approved less than two months later, on May 27, 2011.  It is likewise undisputed that Dr. Partridge's application (given his age, the amount of coverage he wanted, and certain of his responses) prompted USAA Life both to impose "medical requirements," in the form of an interview and an examination, and to request certain medical records.  On April 1, 2011--two days after he submitted his application--USAA Life both advised Dr. Partridge of the medical requirements and ordered the medical records.

It was not until roughly two weeks later, however, in mid-April 2011, that USAA Life received the completed "medical requirements," and it was still waiting on the medical records at that point.  On April 22, 2011, USAA Life contacted Dr. Partridge to advise him that it was still waiting for the records, from

Exeter Hospital, and suggested that he call the hospital to "speed up the process."  USAA Life received the records by May 10, 2011, at the earliest.[11]  On May 19, 2011, the company reviewed them and found them to reveal that Dr. Partridge "potentially engaged in rock and mountain climbing activities," requiring him to complete an additional form.  This form was either sent to Dr. Partridge on May 21, 2011 and returned by him on May 23, 2011, or sent to him on May 25, 2011 and returned by him within a day or two.  Again, USAA Life notified Dr. Partridge that it had accepted his application on May 27, 2011.

In her objection to USAA Life's summary judgment motion, Mrs. Partridge points to two "crucial moments" that she sees as "unexplained" by this chronology:  the 9-day gap between when USAA Life received Dr. Partridge's medical records and when it reviewed them, and either the 6-day gap between when it reviewed them and when it advised him that he would need to submit additional information about any climbing activities, or the

---

[11]Though USAA Life presents evidence that it had yet to get the records by May 8, 2011, it does not say when it actually got them.  Mrs. Partridge points to an internal document indicating receipt of the records on May 10, 2011, which, taking the evidence in the light most favorable to her, the court has accepted as the date of receipt. Mrs. Partridge further suggests that the document could be read to indicate that the records were not even requested until then, but the court does not consider that a reasonable reading of the document, at least on the record as it stands.

4-day gap between when it received that information and approved his application.  But it does not follow from these two brief periods of delay, however "unexplained," that USAA failed to act on his application within a reasonable time, as Mrs. Partridge claims the company had the obligation to do.

Again, USAA Life approved Dr. Partridge's application for $1 million in life insurance less than 60 days after he submitted it--and it spent the first 40 days of that period waiting for medical records it had requested just 2 days after he made his application.  Mrs. Partridge has not questioned that those records were necessary for USAA Life to properly consider the application, nor does she suggest that the company reasonably could have done more to get the records more promptly (indeed, it is undisputed that, even after USAA Life asked Dr. Partridge to call the hospital to "speed up the process," 18 more days passed before the records were ultimately received).  More importantly, Mrs. Partridge has not come forward with any evidence suggesting a standard of care that requires an insurance company either to act on an application for a policy, or to review medical records or other additional information obtained from the applicant, within any particular period of time.[12]

_____

[12]Mrs. Partridge points to a few statements by USAA Life that, she says, "made an affirmative commitment to process the application as quickly as possible."  A pledge to do something

Based on this record, no rational jury could find that USAA Life failed to act on Dr. Partridge's application within a reasonable time, even if it had the duty to do so under New Hampshire law. See Bickford, 114 N.H. at 240 (upholding finding that insurer was not negligent where "[t]he record demonstrates that it acted promptly on the application once it received the proper information"); 1A Couch, supra, § 11:10 ("Delays have been found reasonable when the insurer sought diligently to obtain additional information regarding the risk"). For this reason alone, USAA Life is entitled to summary judgment on Mrs. Partridge's negligence claim.

Second, USAA Life is entitled to summary judgment on the negligence claim for the independent reason that, even if it did unreasonably delay its approval of Dr. Partridge's application, that did not proximately cause the harm that Mrs. Partridge seeks to recover here--which, as she clarifies in her objection to USAA

---

"as quickly as possible," though, is simply too vague to give rise to liability. See, e.g., Messer v. Smyth, 59 N.H. 41 (1879). In any event, the statements merely encouraged Dr. Partridge to expeditiously arrange for the company's receipt of outstanding information, such as his medical records. While, in one communication, USAA Life stated that "[i]t may take 2 to 4 weeks from the time you complete your medical exam to receive a final decision," the same document expressly warned that "if medical records are requested from your physician or a medical facility, a delay may occur in the final decision process until all records have been received and evaluated"--which, of course, is just what happened here.

30

Life's motion, is the full death benefit under the insurance policy.  "The concept of proximate cause includes both the cause-in-fact and the legal cause of the injury.  A defendant's conduct is the legal cause of harm if he could have reasonably foreseen that his conduct would result in an injury, or if his conduct was unreasonable in light of what he could anticipate."  Goss v. New Hampshire, 142 N.H. 915, 917 (1998).

To show proximate cause here, then, Mrs. Partridge would have to show that USAA Life could have reasonably foreseen that, because an undue delay in approving Dr. Partridge's application meant that the clock on its suicide exclusion started running later than it would have if the company had timely given its approval, Dr. Partridge would have committed suicide before the exclusion expired.  There is no evidence that this risk was reasonably foreseeable to USAA Life:  that it should have realized that, by not acting on Dr. Partridge's application more promptly, it was somehow subjecting him to the risk that he would kill himself before the exclusion period expired.  Indeed, an event like suicide is unpredictable enough that, absent indications that a person presents a particular risk--indications that, by all accounts, Dr. Partridge was not displaying until long after USAA Life issued the insurance policy--there would

seem to be no basis at all for anticipating that it might occur within any specified time frame.

In her objection to USAA Life's summary judgment motion, Mrs. Partridge does not address the foreseeability of the injury for which she seeks to recover, i.e., her disentitlement to the full death benefit because the suicide exclusion had not yet run at the time of Dr. Partridge's death. She states only that "the lost proceeds of his life insurance policy" were foreseeable "in light of the emphasis both [he] and [USAA Life] placed on processing his application in a timely manner." This argument might have some force if Dr. Partridge had died, in a manner not excluded under the policy, after the time that a reasonably prompt insurer allegedly would have approved his application but before the time USAA Life actually did so. Cf. Hadler, 109 N.H. at 456 (reasoning that insurer could be liable for its negligent delay in failing to issue the policy where it "knew that [the applicant] was in poor health and the risk of death was great"). But that is not what happened here, and what did happen--Dr. Partridge's death by suicide just two days before the suicide exclusion expired--was not reasonably foreseeable to USAA Life so as to hold it liable in negligence for failing to issue the policy, and start the running of the exclusion, earlier. USAA Life is entitled to summary judgment on the negligence claim.

## IV.  **Conclusion**

For the foregoing reasons, Mrs. Partridge's motion for summary judgment[13] is DENIED, and USAA Life's motion for summary judgment[14] is GRANTED.  The clerk shall enter judgment accordingly and close the case.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  March 19, 2014

cc:  Philip L. Pettis, Esq.
     Michael H. Darling, Esq.
     Michael F. Aylward, Esq.

---

[13]Document no. 10.

[14]Document no. 11.

33